**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

Dr. Chantelle Teasdell )
19876 Somercote Ln. )
Leesberg, VA 20175 )
)
Glendora Meyers )
3352 Alden Pl. NE )
Washington, DC 20001 )  Civil Action No. 15-445
)
Jamal Jones )
56 Tuckerman St. NW )
Washington, DC 20001 )
)
      PLAINTIFFS )  **COMPLAINT FOR DAMAGES, INJUNCTIE**
)  **RELIEF, SPECIAL RELIEF AND PUNITIVE**
)  **DAMAGES**
   vs. )  **JURY TRIAL DEMANDED**
)
District of Columbia )
)
Serve: Mayor Muriel Bowser )
1350 Pennsylvania Ave, NW )
Washington, DC 20001 )
)
Dr. John M. Thompson )
500 K Street, NE )
Washington, D.C. 20002 )
)
Camile Williams )
500 K Street, NE )
Washington, D.C. 20002 )
)
DEFENDANTS_____ )

## Introduction

1. Plaintiffs Dr. Chantelle Teasdell, Glendora Meyers, and Jamal Jones bring this action

   against the District of Columbia based on violations of the D.C. Whistleblower

Protection Act, D.C. Code § 1-615.53(a), and the Fair Labor Standards Act, 29 U.S.C. 201 *et seq*. Plaintiff Glendora Meyers also brings her whistleblower claim against Defendants John Thompson and Camile Williams in their personal capacity.

2. The District of Columbia Office on Aging ("Agency"),  Dr. John M. Thompson, and Ms. Camile Williams engaged in a pattern of violations of District of Columbia and Federal laws against their employees, and then retaliated against persons who raised any objection. If Defendants were unable to force the dissenter to quit their job, they ultimately terminated anyone who dared to complain.

3. Defendants also engaged in a pattern of violations of Federal overtime regulations.

**Parties**

4. Dr. Chantelle Teasdell is, and was at all times relevant to this action, a resident of Virginia.

5. Ms. Glendora Meyers is, and was at all times relevant to this action, is a resident of the District of Columbia.

6. Jamal Jones is, and was at all times relevant to this action, is a resident of the District of Columbia.

7. Defendant District of Columbia is a municipal corporation, and an employer as defined by 29 U.S.C. § 203 (d).

8. The Office on Aging (hereafter "The Office") is a subunit of the District of Columbia and is located at 500 K Street, NE, Washington, D.C. 20002.

9. Defendant John M. Thompson is, and was at all times relevant to this action, Director of the District of Columbia Office on Aging.

10. Defendant Camile Williams is, and was at all times relevant to this action, Chief of Staff for Dr. Thompson at the District of Columbia Office on Aging.

**Jurisdiction and venue**

11. Jurisdiction and venue are proper in this District under Federal Question jurisdiction.

**Vicarious Liability Allegations**

12. Under the doctrine of *Respondeat Superior*, an employer is liable for the actions of an employee or agent conducted within the course of their employment.

13. All of the relevant actions by the Defendants were conducted during their regular time as employees of the District and within the scope of their employment.

**Factual Allegations**

### I. Allegations generally applicable to all plaintiffs

14. Defendant District of Columbia failed to keep appropriate records as required by the FLSA, with respect to the Plaintiffs, sufficient to determine wages, hours, and other

conditions and practices of employment in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, including 29 U.S.C. § 211(c).

15. In or about April of 2011, Dr. John M. Thompson returned to the Office as Executive Director.

16. In or about May of 2011, Camile Williams was made Chief of Staff.

17. Plaintiffs have attached as Exhibit 1 a current organizational chart of the Office and incorporate it into their complaint.

18.  All plaintiffs quickly learned that Dr. Thompson and Ms. Williams would, if an employee fell out of their good graces for any reason, engage in a pattern of behavior to sabotage their employment at the agency by giving said employee impossible work requirements and deadlines, and treating the employee terribly until they resigned. If Dr. Thompson and Ms. Williams were unable to get the employee to resign by creating an intolerable work environment, they would fire them either without cause or on trumped-up, meritless charges.

19.  Ms. Williams and Dr. Thompson valued loyalty to themselves personally above all else, and if they felt that an employee was in any way disloyal to them personally, including by prioritizing legal compliance or the goals of the Office and the District of Columbia over the personal whims and desires of Dr. Thompson and Ms. Williams,

the employee would fall out of their good graces and would be pushed out of the

Office by the methods outlined in the previous paragraph.

20. Dr. Thompson and Ms. Williams made sure that all persons who worked for them

knew that anyone who failed to cater to their arbitrary whims would be pushed out

or fired from the Office. Plaintiffs had conversations during and after their tenure at

the Office in which it became apparent that most or all persons working under Dr.

Thompson or Ms. Williams knew that doing anything that demonstrated anything

less than full personal fealty would lead to retaliation and termination.

21. In February or March of 2012, everyone at the Office was required to go to a

mediation run by the District of Columbia Office of Human Rights due to disregard of

District of Columbia Law by Dr. Thompson and Ms. Williams.

22. In 2014, Dr. Thompson and Ms. Williams received a string of age discrimination

complaints from employees of the agency. Defendants did not take the claims

seriously nor examine if the Office may have had a pattern of discrimination or other

prohibited personal practices.

**II. Plaintiff Chantelle Teasdell**

23. Dr. Chantelle Teasdell was hired on January 3, 2011.

24. Upon her hiring, Dr. Teasdell assumed the role as a Program Analyst, CS-12/4, at the

Agency.

25. Throughout her time at the Agency, Dr. Teasdell never received less than a 4 out of 5 in her cumulative score.

26. Because of the excellent work she performed, on January 24, 2012, Dr. Teasdell was promoted to the role of Interim Supervisory Public Health Analyst, also known within the Agency as the Interim Aging and Disability Resource Center ("ADRC") Manager.

27. After she assumed her new position, she continued doing the work of her old position on top of her new work.

28. On June 4, 2012, she was promoted to the role of ADRC Manager.

29. Finally, she was promoted to the role of Associate Director of the Aging and Disability Resource Center on or about August of 2012.

30. From January 24, 2012 until her termination from the Agency, Dr. Teasdell was made to be on call 24 hours a day, 7 days a week, was required to be responsive to email and be available for phone calls at all times, worked overtime without compensation, including weekends and holidays, and was made the point of contact between the Office on Aging and various other entities including the Department of Homeland Security.

31. Dr. Teasdell would often work more than 80-hour weeks without overtime or on-call compensation.

32. On or about December of 2013, Dr. Teasdell informed Ms. Williams and Dr. Thompson that persons were improperly being assigned primary work outside of their job descriptions and classifications, and that in some cases, persons funded by federal grants were being required to do work outside the scope of their grant.

33. Almost immediately after raising these legal issues to Dr. Thompson and Ms. Williams, Ms. Williams and Dr. Thompson began a pattern of retaliation against Dr. Teasdell, which cumulated in her discharge without stated cause on March 27, 2014.

34. This retaliation took several forms, including but not limited to:

    a. In early 2014, just a few weeks after Dr. Teasdell's previous performance review, Ms. Williams attempted to schedule a mid-year performance review. This was done with the intention of fraudulently and dishonestly reducing her ratings below her actual performance so as to create a pretense for firing Dr. Teasdell.

    b. In or around January of 2014, Dr. Teasdell was harassed constantly by Chief of Staff Camile Williams to produce a very labor-intensive "required" report to the Deputy Mayor, but when Dr. Teasdell asked the Deputy Mayor's office about such a report, she was told that the Deputy Mayor's office did not need or request the report.

c.  In or around February of 2014, Dr. Thompson intentionally gave out Dr.
    Teasdell's government cell phone number on the news during a snow
    emergency, and told the public to call her with issues. This lead to nearly 48
    hours of constant work for Dr. Teasdell.

d.  Dr. Thompson and Ms. Williams required Dr. Teasdell to keep her staff on call
    at all times, and would require her to make them work extra hours and
    sometimes weekends. Dr. Teasdell's staff was not exempt from overtime pay
    according to the Civil Service rules and the Federal Fair Labor Standards Act.
    Defendants knew this, but required them to work overtime without
    additional compensation anyway.

e.  In or about March of 2014, Dr. Teasdell was forced to move out of her office in
    order to give her space to a new person working with Chief of Staff Camile
    Williams. Dr. Teasdell, though Associate Director of the ADRC at this time,
    ceased to have an office up until her termination from the Agency.

f.  In March of 2014, in closed-door meetings, Ms. Williams and Dr. Thompson
    would make various complaints about Dr. Teasdell. A close friend of Ms.
    Williams, Lordine, came to Ms. Glendora Meyers with a formal complaint that
    Dr. Teasdell wore inappropriate dress to an off-site meeting. Soon thereafter,
    a close friend of Lordine came to Ms. Meyers with the same complaint,
    verbatim. It is highly unusual for two people to come to Human Resources

with the same complaint, particularly a complaint of such a minor nature. Ms. Williams instructed the complainants to reduce their complaints to writing, as was required by procedure. Only Lordine proceeded with her complaint.

The complaints were entirely without merit, and appeared to have been made at Ms. Williams' suggestion or demand. Ms Williams took a very strong personal interest in the complaint, and would daily ask Ms. Williams when the mediation would be for Lordine's complaint. This strong personal interest was demonstrative of Ms. Williams' desire to push out Dr. Teasdell as quickly as possible.

35. Dr. Teasdell responded to this adversity by working longer and longer hours to keep up with the impossible workload that she was being forced to endure.

36. In or around the end of March of 2014, Dr. Teasdell was approached by several staff members stating that they have not been compensated for their overtime.

37. After receiving the complaints, Dr. Teasdell told Ms. Meyers, who was the designated head of Human Resources in the Office at the time, that it was illegal to force non-exempt employees to work without overtime compensation. Ms. Meyers informed Dr. Teasdell that she would attempt to resolve the situation. However, Dr. Thompson and Ms. Williams continued to demand illegal overtime from Dr. Teasdell's staff and other persons in the Office.

38. In or around the end of March of 2014, Dr. Teasdell spoke with General Counsel
Deborah Royster about the systemic practice and pattern at the Agency of not paying
overtime to entitled employees. She included in her discussion with General Counsel
Royster how Dr. Thompson had asked Dr. Teasdell to keep an on-call staff who were
not paid overtime, how several other employees were not being paid overtime, and
how she herself had not been paid overtime for her work as Interim ADRC Manager.

39. During the conversation, Dr. Teasdell asked Ms. Royster not to tell Dr. Thompson or
Ms. Williams that she had reported the violations of law. Dr. Teasdell told Ms.
Royster that if Dr. Thompson found out she had reported the violations, she would
immediately be fired.

40. Ms. Royster informed Dr. Teasdell that she was obligated to take the matter up with
the appropriate people, who included Dr. Thompson.

41. Ms. Royster caused Dr. Thompson to find out that Dr. Teasdell had reported the
overtime violations.

42. Two days later, on March, 27 2014, Dr. Thompson was terminated. Her termination
letter stated that she was fired without cause, and that she could not appeal the
termination.

43. Ms. Teasdell was, in fact, fired because she reported the violations of the Fair Labor
Standards Act.

**III. Plaintiff Glendora Meyers**

44. Glendora Meyers was hired by the Office on Aging on August 27, 2012.

45. Ms. Meyers was initially hired as a Management Liaison Specialist at the Agency.

46. She was later promoted to Administrative Officer, MS-14, working within the
    General Services Division, and her job responsibilities included managing HR for the
    Agency.

47. Prior to her promotion to Administrative Officer, Ms. Meyers was performing the
    duties of both the Management Liaison Specialist and Administrative Officer. She
    received no compensation for this extra work.

48. Throughout her time with the Agency, Ms. Meyers received good performance
    reviews.

49. Dr. Thompson and Camile Williams served as supervisors to Ms. Meyers.

50. Also, in or around June of 2013, Ms. Meyers contacted OSHA regarding poor building
    and work conditions, including but not limited to consistent heating and air
    conditioning problems making the work environment unbearably hot or cold.

51. In or around January of 2014, the Agency added a Facilities Specialist role to Ms.
    Meyers' responsibilities. At this time, Ms. Meyers was performing the Management
    Liaison Specialist, Administrative Officer, and Facilities Specialist roles.

52. Because of the added responsibilities and job roles, Ms. Meyers often worked overtime, holidays, and weekends without compensation.

53. In or around the end of March of 2014, Ms. Meyers spoke with General Counsel Deborah Royster regarding her lack of compensation and other problems in the work environment.

54. At that time, Dr. Thompson and Camile Williams began to harass Ms. Meyers in order to create an intolerable work environment and push her out of the agency.

55. In or around July of 2014, Ms. Williams chastised Ms. Meyers loudly and without cause in front of her colleagues. Dr. Thompson engaged in similar behavior via email.

56. Ms. Williams told other staff at the Agency not to talk to Ms. Meyers in order to further isolate her and in order to intimidate staff into staying in the good graces of Ms. Williams and Dr. Thompson.

57. Dr. Thompson and Ms. Williams continued their campaign of harassment and intimidation, and they also continued to increase her workload such that there were simply not enough hours in the day for her to meet her responsibilities.

58. When Ms. Meyers' fiancé died, Defendants refused to approve any time off for Ms. Meyers. When Ms. Meyers made her request for time off, Defendants demanded the name, address and phone number for the funeral home, and also the address of Ms.

Meyers' fiancé's parents. This information was not demanded from other persons who requested bereavement leave.

59. When Ms. Meyers took leave against Ms. Williams' wishes so she could attend the funeral, Ms. Williams continued to call and text her to demand work, even during the funeral service itself.

60. In or around August of 2014, because of the constant harassment, ridicule, and emotional abuse by Dr. Thompson and Ms. Williams and the stress induced by the extreme workload Ms. Williams placed on Ms. Meyers, such as requiring her to perform the duties of three persons, Ms. Meyers had to be sedated by a psychologist.

61. In December of 2014,  Ms. Williams ordered Ms. Meyers to hire two new people, but Ms. Meyers was not allowed to interview qualified candidates. Rather, Ms. Williams and Dr. Thompson chose to staff the positions with persons they believed were personally loyal. One of the persons hired did not know how to use email.

62. On January 11, 2015, Ms. Meyers wrote an email Chief of Staff Camile Williams that Ms. Meyers felt she was working in a hostile work environment.

63. In early January of 2015, Ms. Meyers spoke with Executive Director Dr. Thompson, Chief of Staff Camile Williams, and Agency attorneys about the Agency's systemic practice and pattern of not paying employees entitled overtime and that the agency was in violation of many OSHA workplace safety rules..

64. On January 23, 2015, Ms. Meyers was given notice of her pending termination.

65. On February 6 2015, Ms. Meyers was terminated without stated cause.

## IV. Plaintiff Jamal Jones

66. Jamal Jones was hired in July of 2013.

67. Mr. Jones was hired in the role of an Executive Assistant to Dr. Thompson, but Mr.
    Jones also would perform tasks for Chief of Staff Camile Williams.

68. Dr. Thompson and Camile Williams were Mr. Jones's supervisors.

69. Within weeks of starting at the Agency, Mr. Jones was harassed and intimidated by
    Camile Williams. She created for him a threatening work environment.

70. Mr. Jones was often required to work nights and overtime. He accumulated over 100
    hours of overtime hours during his employment which remain unpaid.

71. By February of 2014, Mr. Jones was working up to 60 hours a week on various
    projects without overtime compensation.

72. In mid-February 2014, Dr. Thompson ordered Mr. Jones to work overtime to
    complete a complicated report. Mr. Jones refused to work further overtime without
    compensation.

73. On February 14, 2014, Mr. Jones was terminated.

**COUNT 1:  Violation of the DC Whistleblower Act (Plaintiffs Teasdell and Meyers)**

74. The D.C. Whistleblower Protection Act, D.C. Code § 1-615.51 *et seq*., is a statute which finds and declares that the public interest is best served when District of Columbia governmental employees are free to report waste, fraud, abuse of authority, violations of law, or threats to the public health or safety without fear of reprisal or retaliation.

75. Because of this purpose, it is against the law for a supervisor to take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order.  § 1-615.53(a). An employee aggrieved by a violation of § 1-615.53 may bring an action against the District and, in his or her own official capacity, any District employee, supervisor, or official having personal involvement before a court. § 1-615.54(a)(1).

76. Here, Defendants District of Columbia, Dr. John M. Thompson, and Ms. Camille Williams all acted in violation of the Act by retaliating against Dr. Chantelle Teasdell and Ms. Glendora Meyers after each former District employee reported the systemic and unlawful practice by the Agency to not pay its employees back pay and overtime,

as required by law, and for other unlawful reasons as explained without limitation in this complaint. Defendants' retaliation manifested itself in the termination of Dr. Teasdell and Ms. Meyers.

**COUNT 2:  Violation of the Fair Labor Standards Act (29 U.S.C. § 207) (All Plaintiffs, against Defendant District of Columbia)**

77.  The Fair Labor Standards Act, 29 U.S.C. § 207 (a) (1) requires that no employer shall employ an employee for a workweek longer than 40 hours, unless the employee receives compensation for employment in excess of 40 hours at a rate not less than 1 ½ times the regular rate at which the employee is employed.

78. The act exempts certain employees in executive and administrative pay categories. 29 U.S.C. § 213 (a).

79. In order to qualify for the exemption, an employer must pay the employee and all persons in their job class on a "salary basis". *See* 29 CFR § 541.603.

80. For an employee to be considered paid on a "salary basis," they cannot be subject to deductions in pay for absences less than one full day. *See* 29 CFR § 541.602.

81. The Office on Aging had a policy and practice of requiring Dr. Teasdell, Glendora Meyers and other persons in the same and similar job classifications to take "annual leave" hours when they had partial-day absences during regular business hours.

82. Annual leave may be redeemed for cash payment at the end of employment, and is a part of plaintiffs' employment compensation.

83. Because Defendants required Dr. Teasdell and others in her job class to use annual leave for absences less than one day, Dr. Teasdell and others in her job classification were not paid on a salary basis, and therefore were not exempt from the Fair Labor Standards Act overtime pay requirements.

84. Plaintiff Jamal Jones is classified as non-exempt by the District of Columbia due to his job responsibilities and is not exempt from the Fair Labor Standard's Act's overtime requirements.

85. Defendants sometimes required Plaintiff Jamal Jones and persons similarly situated to work in excess of 40 hours a week without overtime compensation.

86. At the beginning of his tenure with the District of Columbia, Mr. Jones was compensated for his overtime, but toward the middle and end of his employment, Defendants required Mr. Jones to work increasingly long periods in excess of 40 hours per week without providing overtime compensation.

87. Mr. Jones was fired because he refused to work overtime without compensation.

88. Defendants continued rampant violations of the FLSA even after multiple employees attempted to deal with the issue at the highest levels of the Office, and with Counsel for the District of Columbia, demonstrates that the FLSA violations were willful.

89. As a remedy for Defendants' violation of the Fair Labor Standards Act, Plaintiffs are entitled to double damages. 29 U.S.C. 216 (d). Plaintiffs are also entitled to reinstatement because they were fired in retaliation for reporting FLSA violations. *Id.* Plaintiffs further seek court costs and attorneys fees. *Id.*

**PRAYER FOR RELIEF (All Plaintiffs)**

WHEREFORE, Plaintiffs respectfully pray that judgment for each violation be entered against the Defendants, jointly and severally for the following:

1. Declaratory judgment that Defendants' conduct violated the D.C. Whistleblower Act and the Fair Labor Standards Act;

2. Reinstatement to the same position held before the prohibited personnel action or to an equivalent position;

3. Reinstatement of employee's seniority rights;

4. Restoration of lost benefits;

5. Back pay and interest on back pay;

6. Front pay;

7. Compensatory damages;

8.  Other actual damages, incidental damages, and consequential damages as will be
    proved at trial against each of the Defendants, jointly and severally;

9.  Interest on all sums;

10. Special damages as permitted by law;

11. Punitive damages as will be proven at trial against each of the Defendants, jointly
    and severally;

12. Court costs, expenses and reasonable attorneys fees;

13. Any and all such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,


_____/s/_____
Daniel Hornal
D.C. Bar No. 1005381
Talos Law
705 4th St., NW #403
Washington, DC 20001
(202) 709-9662
Daniel@taloslaw.com

Attorney for Plaintiffs

Complaint                                                Page 19 of 19