# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Dr. Chantelle Teasdell
19876 Somercote Ln.
Leesberg, VA 20175

Glendora Meyers
3352 Alden Pl. NE
Washington, DC 20001

Jamal Jones
56 Tuckerman St. NW
Washington, DC 20001

        PLAINTIFFS

        vs.

District of Columbia

Serve: Mayor Muriel Bowser
1350 Pennsylvania Ave, NW
Washington, DC 20001

Dr. John M. Thompson
500 K Street, NE
Washington, D.C. 20002

Camile Williams
500 K Street, NE
Washington, D.C. 20002

DEFENDANTS

_____

)
)
)
)
)
)
)
) Civil Action No. 15-445
)
)
)
)
)
)
) **FIRST AMENDED COMPLAINT FOR**
) **DAMAGES, INJUNCTIE RELIEF, SPECIAL**
) **RELIEF AND PUNITIVE DAMAGES**
)
) **JURY TRIAL DEMANDED**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Complaint                                              Page 1 of 23

# COMPLAINT

## Introduction

1. Plaintiffs Dr. Chantelle Teasdell, Glendora Meyers, and Jamal Jones bring this action against the District of Columbia based on violations of the D.C. Whistleblower Protection Act, D.C. Code § 1-615.53 (a), and the Fair Labor Standards Act, 29 U.S.C. 201 *et seq*. Plaintiff Glendora Meyers also brings her whistleblower claim against Defendants John Thompson and Camile Williams in their personal capacity.

2. The District of Columbia Office on Aging ("Agency"),  Dr. John M. Thompson, and Ms. Camile Williams engaged in a pattern of violations of District of Columbia and Federal laws against their employees, and then retaliated against persons who raised any objection. If Defendants were unable to force the dissenter to quit their job, they ultimately terminated anyone who dared to complain.

3. Defendants also engaged in a pattern of violations of Federal overtime regulations.

## Parties

4. Dr. Chantelle Teasdell is, and was at all times relevant to this action, a resident of Virginia.

5. Ms. Glendora Meyers is, and was at all times relevant to this action, a resident of the District of Columbia.

6.  Jamal Jones is, and was at all times relevant to this action, a resident of the District of Columbia.

7.  Defendant District of Columbia is a municipal corporation, and an employer as defined by 29 U.S.C. § 203 (d).

8.  The Office on Aging (hereafter the "Office") is a subunit of the District of Columbia and is located at 500 K Street, NE, Washington, DC 20002.

9.  Defendant John M. Thompson is, and was at all times relevant to this action, Director of the District of Columbia Office on Aging.

10.  Defendant Camile Williams is, and was at all times relevant to this action, Chief of Staff for Dr. Thompson at the District of Columbia Office on Aging.

## Jurisdiction and venue

11.  Jurisdiction and venue are proper in this District under federal question jurisdiction and supplemental jurisdiction.

## Vicarious Liability Allegations

12.  Under the doctrine of *respondeat superior*, an employer is liable for the actions of an employee or agent conducted within the course of their employment.

13.  All of the relevant actions by the Defendants were conducted during their regular time as employees of the District and within the scope of their employment.

**Factual Allegations**

### I. Allegations generally applicable to all plaintiffs

14. Defendant District of Columbia failed to keep appropriate records as required by the FLSA, with respect to the Plaintiffs, sufficient to determine wages, hours, and other conditions and practices of employment in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, including 29 U.S.C. § 211(c).

15. On March 22, 2011, Dr. John M. Thompson returned to the Office on Aging as Executive Director.

16. In or about April of 2011, he made Camile Williams his Chief of Staff.

17. Plaintiffs hereby incorporate a current organizational chart of the Office into their complaint. This chart is attached as Exhibit 1 to Plaintiff's original complaint.

18.  All plaintiffs quickly learned that Dr. Thompson and Ms. Williams would, if an employee fell out of their good graces for any reason, engage in a pattern of behavior to sabotage their employment at the agency by giving said employee impossible work requirements and deadlines, and treating the employee terribly until they resigned. If Dr. Thompson and Ms. Williams were unable to get the employee to resign by creating an intolerable work environment, they would fire them either without cause or on trumped-up, meritless charges based, if practicable, on false performance evaluations and reviews.

19. Ms. Williams and Dr. Thompson valued personal loyalty above all else, and if they felt that an employee was in any way personally disloyal to them, then that employee would fall out of their good graces and would be pushed out of the Office by the methods outlined above.

20. To Dr. Thompson and Ms. Williams, disloyalty from employees included, but was not limited to, those employees who prioritized legal compliance or the goals of the Office and the District of Columbia over the personal whims and desires of Dr. Thompson and Ms. Williams.

21. Dr. Thompson and Ms. Williams made sure that all persons who worked for them knew that anyone who failed to cater to their arbitrary whims would be pushed out or fired from the Office. Plaintiffs had conversations during and after their tenure at the Office in which it became apparent that most or all persons working under Dr. Thompson or Ms. Williams knew that doing anything that demonstrated anything less than full personal fealty would lead to retaliation and, often, termination.

22. In February or March of 2012, everyone at the Office was required to go to a mediation run by the District of Columbia Office of Human Rights, due to Dr. Thompson's and Ms. Williams' disregard of and for District of Columbia Law.

23. In 2014, Dr. Thompson and Ms. Williams received a string of age discrimination complaints from employees of the agency. Defendants did not take the claims

seriously nor examine if the Office may have had a pattern of discrimination or other prohibited personnel practices.

## II. Plaintiff Chantelle Teasdell

24. Dr. Chantelle Teasdell was hired on January 3, 2011.

25. Upon her hiring, Dr. Teasdell assumed the role as a Program Analyst, CS-12/4, at the Agency.

26. Throughout her time at the Agency, Dr. Teasdell was a model employee and never received less than a 4 out of 5 in her cumulative score in her performance reviews.

27. On January 24, 2012, because of the excellent work she performed, Dr. Teasdell was promoted to the role of Interim Supervisory Public Health Analyst, also known within the Agency as the Interim Aging and Disability Resource Center ("ADRC") Manager.

28. After she assumed her new position, she continued doing the work of her old position on top of her new work.

29. On June 4, 2012, she was promoted to the role of ADRC Manager.

30. Finally, she was promoted to the role of Associate Director of the Aging and Disability Resource Center on or about August of 2012.

31. From January 24, 2012 until her termination from the Agency, Dr. Teasdell was made to be on call 24 hours a day, 7 days a week, was required to be responsive to email and be available for phone calls at all times, worked overtime without compensation, including weekends and holidays, and was made the point of contact between the Office on Aging and various other entities including the Department of Homeland Security.

32. Dr. Teasdell would often work more than 80-hour weeks without overtime or on-call compensation.

33. On or about December of 2013, Dr. Teasdell informed Ms. Williams and Dr. Thompson that persons were improperly being assigned primary work outside of their job descriptions and classifications, and that in some cases, persons funded by federal grants were being required to do work outside the scope of their grant.

34. Almost immediately after raising these legal issues to Dr. Thompson and Ms. Williams, Ms. Williams and Dr. Thompson began a pattern of retaliation against Dr. Teasdell, which culminated in her discharge without stated cause on March 27, 2014.

35. This retaliation took several forms, including but not limited to:

   a. In early 2014, just a few weeks after Dr. Teasdell's previous performance review, Ms. Williams attempted to schedule a mid-year performance review.

This was scheduled with the intention of fraudulently and dishonestly reducing her ratings below her actual performance so as to create a pretense for firing Dr. Teasdell.

b.  In or around January of 2014, Dr. Teasdell was harassed constantly by Chief of Staff Camile Williams to produce a very labor-intensive "required" report to the Deputy Mayor, but when Dr. Teasdell asked the Deputy Mayor's office about such a report, she was told that the Deputy Mayor's office did not need or request the report.

c.  In or around February of 2014, Dr. Thompson intentionally gave out Dr. Teasdell's government cell phone number on the news during a snow emergency, and told the public to call her with issues. This caused Dr. Teasdell alone to be bombarded with calls from seniors throughout the District, for 48 hours straight.

d.  Dr. Thompson and Ms. Williams required Dr. Teasdell to keep her staff on call at all times, and would require her to make them work extra hours and sometimes weekends. Dr. Teasdell's staff was not exempt from overtime pay according to the Civil Service rules and the Federal Fair Labor Standards Act. Defendants knew this, but required them to work overtime without additional compensation or compensatory time.

e. In or about March of 2014, Dr. Teasdell was forced to move out of her office in order to give her space to a new person working with Chief of Staff Camile Williams. Dr. Teasdell, though Associate Director of the ADRC at this time, ceased to have an office up until her termination from the Agency.

f. In March of 2014, in closed-door meetings, Ms. Williams and Dr. Thompson would make various complaints about Dr. Teasdell. A close friend of Ms. Williams, Lordine, came to Ms. Glendora Meyers with a formal complaint that Dr. Teasdell wore inappropriate dress to an off-site meeting. Soon thereafter, a close friend of Lordine came to Ms. Meyers with the same complaint, verbatim. It is highly unusual for two people to come to Human Resources with the same complaint, particularly a complaint of such a minor nature. Ms. Williams instructed the complainants to reduce their complaints to writing, as was required by procedure. Only Lordine proceeded with her complaint.

The complaints were entirely without merit, and were made at Ms. Williams' suggestion or demand. Ms Williams took a very strong personal interest in the complaint, and would daily ask Ms. Williams when the mediation would be for Lordine's complaint. This strong personal interest was demonstrative of Ms. Williams' desire to push out Dr. Teasdell as quickly as possible.

36. Dr. Teasdell responded to this adversity learning to cope with the adversity, and by working longer and longer hours to keep up with the impossible workload that she was being forced to endure.

37. In or around the end of March of 2014, Dr. Teasdell was approached by several staff members stating that they have not been compensated for their overtime.

38. After receiving the complaints, Dr. Teasdell told Ms. Meyers, who was the designated head of Human Resources in the Office at the time, that it was illegal to force non-exempt employees to work without overtime compensation. Ms. Meyers informed Dr. Teasdell that she would attempt to resolve the situation. However, Dr. Thompson and Ms. Williams continued to intentionally demand illegal overtime from Dr. Teasdell's staff and other persons in the Office.

39. In or around the end of March of 2014, Dr. Teasdell verbalized a complaint with General Counsel Deborah Royster regarding the Agency's FLSA violations, namely the systemic practice and pattern of not paying overtime to entitled employees. Dr. Teasdell included in her discussion with General Counsel Royster: 1) how Dr. Thompson had asked her to keep an on-call staff who were not paid overtime; 2) how several other employees were not being paid overtime; and 3) how she herself had not been paid overtime for her work as Interim ADRC Manager.

40. During this conversation, in which Dr. Teasdell lodged her internal complaint, Dr. Teasdell asked Ms. Royster not to tell Dr. Thompson or Ms. Williams that she had

reported the violations of law. Dr. Teasdell told Ms. Royster that if Dr. Thompson or Ms. Williams found out she had reported the violations, she would immediately be fired.

41. Ms. Royster informed Dr. Teasdell that she was obligated to take the matter up with the appropriate people, who included Dr. Thompson and Ms. Williams.

42. Ms. Royster caused Dr. Thompson and Ms. Williams to find out that Dr. Teasdell had reported the overtime violations.

43. Two days later, on March 27, 2014, Dr. Teasdell was terminated. Her termination letter stated that she was fired without cause, and that she could not appeal the termination.

44. Ms. Teasdell was, in fact, fired because she reported the violations of the Fair Labor Standards Act to Mss. Meyers and Royster.

## III. Plaintiff Glendora Meyers

45. Glendora Meyers was hired by the Office on Aging on August 27, 2012.

46. Ms. Meyers was initially hired as a Management Liaison Specialist at the Agency.

47. In or around March of 2013, she was later promoted to Administrative Officer, MS-14, working within the General Services Division.

48. Included among Ms. Meyers' job responsibilities was managing HR for the Agency.

49. Prior to her promotion to Administrative Officer, however, Ms. Meyers was performing the duties of both the Management Liaison Specialist and Administrative Officer.

50. During this time, Dr. John Thompson, who, along with Camile Williams, served as Ms. Meyers' supervisor, told Ms. Meyers that she should expect to be compensated for the additional work Ms. Meyers was doing as a "chief administrative officer," which at the time constituted a salary of $110,000. To this day, Ms. Meyers has received none of that compensation.

51. Throughout her time with the Agency, Ms. Meyers received good performance reviews.

52. During her time at the Agency, Ms. Meyers observed numerous violations of the FLSA, the OSH Act, and other violations of law and regulation which she promptly formulated strategies to address, including but not limited to:

   a. In or around June of 2013, Ms. Meyers contacted OSHA regarding poor building and work conditions, including but not limited to consistent heating and air conditioning problems, making the work environment unbearably hot or cold.

b.  In or around the end of 2013, in a meeting attended by Ms. Meyers and the Executive Team Dr. Thompson said that it would be agency policy to pay no more than two hours of overtime, regardless of the number of hours actually worked.

53. In or around January of 2014, the Agency added a Facilities Specialist role to Ms. Meyers' already immense workload. At this time, Ms. Meyers was performing the Management Liaison Specialist, Administrative Officer, and Facilities Specialist roles.

54. Because of the added responsibilities and job roles, Ms. Meyers often worked overtime, holidays, and weekends without compensation.

55. In or around the end of March of 2014, Ms. Meyers verbalized a complaint with General Counsel Deborah Royster regarding her lack of compensation and other problems in the work environment.

56. Ms. Meyers and General Counsel Royster researched the law, and Ms. Meyers pulled the laws and regulations from the D.C. DPM. Ms. Meyers further drafted a memorandum regarding overtime, including the differences between exempt versus non-exempt employees.  This draft memo was sent to Ms. Royster to review for legal sufficiency.

57. Ms. Royster sent Ms. Meyers' draft to DCHR's General Counsel for further review. DCHR sent the memorandum back to Ms. Meyers, stating that it was legally

sufficient.  Ms. Meyers then disseminated and presented this information to the

Office on Aging's Executive Team, which at the time she was in their good graces.

58. In conjunction with this memorandum, Ms. Meyers also sent emails to the managers

instructing them on the type of classification their employees had (*i.e.,* whether the

employees were eligible for comp time earned or exempt time earned).

59. On at least ten occasions, Ms. Meyers told Dr. Thompson and Ms. Williams that the

Agency was in violation of federal overtime law and regulation and that ignoring and

continuing to violate these laws and regulations would adversely affect the Agency

should they continue.

60. This continuous guidance was a direct result of the myriad of complaints received by

Ms. Meyers from employees who were being illegally underpaid, overworked, and

intimidated into silence for fear of losing their jobs.

61. Ms. Meyers also included this overtime guidance in new employee orientation and

training.

62. Because Dr. Thompson and Camile Williams did not want to pay overtime regardless

of their legal obligations, Dr. Thompson and Ms. Williams decided that Ms. Meyers

was not loayl and needed to be pushed out.  Ms. Meyers immediately fell out of their

good graces, and Williams and Thompson began to harass and belittle Ms. Meyers in

order to create an intolerable work environment and push her out of the agency.

63. This included, but was not limited to, creating unreasonable productivity deadlines and overwhelming amounts of work in order to create a false "performance-based" case against Ms. Meyers, such that they could create a pretense to fire her.

64. In or around July of 2014, Ms. Williams chastised Ms. Meyers loudly and without cause in front of her colleagues. Dr. Thompson engaged in similar behavior via email.

65. Ms. Williams and Dr. Thompson did not treat similarly-situated employees who had not reported violations of District regulation and Federal law with the same public contempt.

66. Ms. Williams told other staff at the Agency not to talk to Ms. Meyers in order to further isolate her and in order to intimidate staff into staying in the good graces of Ms. Williams and Dr. Thompson.

67. Dr. Thompson and Ms. Williams would also instruct other managers to avoid talking to, confiding in, or asking questions to Ms. Meyers, because "she didn't know what she was doing" and that "they couldn't trust her."

68. Dr. Thompson and Ms. Williams continued their campaign of harassment and intimidation, and they also continued to increase her workload such that there were simply not enough hours in the day for her to meet her responsibilities.

69. When Ms. Meyers' fiancé died, Defendants refused to approve any time off for Ms. Meyers. When Ms. Meyers made her request for time off, Defendants demanded the

name, address and phone number for the funeral home, and also the address of Ms.

Meyers' fiancé's parents. This information was not demanded from other persons

who requested bereavement leave.

70. Ms. Meyers took leave against Ms. Williams' wishes, so she could attend the funeral.

71. During Ms. Meyers' bereavement leave, Ms. Williams called and texted Ms. Meyers'

to demand work, even during the funeral service itself.

72. In or around August of 2014, because of the constant harassment, ridicule, and

emotional abuse by Dr. Thompson and Ms. Williams and the stress induced by the

extreme workload Ms. Williams placed on Ms. Meyers, such as requiring her to

perform the duties of three persons, Ms. Meyers had to be sedated by a psychiatrist.

73. In December of 2014,  Ms. Williams ordered Ms. Meyers to hire two new people to

be under her purview. Ms. Meyers was not permitted, however, to make the final

decision on who to hire for her department. Other managers were allowed such

discretion.

74. Rather, Ms. Williams and Dr. Thompson chose to staff the positions with unqualified

or underqualfied persons whom they personally knew, individuals who they deemed

as loyal and/or easy to manipulate.

75. As an example of the total disregard of the merit system in order to solidify their hold on the Agency, one person hired into a high-level position couldn't even use email when he was hired.

76. Due to Dr. Thompson and Ms. Williams continuing and escalating harassment, on January 11, 2015, Ms. Meyers wrote an email to Chief of Staff Camile Williams informing Ms. Williams that she felt she was working in a hostile work environment.

77. In mid-January of 2015, Ms. Meyers complained again to Executive Director Dr. Thompson, Chief of Staff Camile Williams, and Agency attorneys about the Agency's systemic practice and pattern of not paying employees FLSA-entitled overtime and that the agency was in violation of many OSHA workplace safety rules.

78. On January 23, 2015, shortly after filing a complaint with Dr. Thompson, Ms. Williams, and Agency attorneys, Ms. Meyers was given notice of her pending termination.

79. On February 6 2015, Ms. Meyers was terminated without stated cause.

**V. Plaintiff Jamal Jones**

80. Jamal Jones was hired in July of 2013.

81. Mr. Jones was hired in the role of an Executive Assistant to Dr. Thompson, who was the head of the Office on Aging, but Mr. Jones also would perform tasks for Chief of Staff Camile Williams.

82. Dr. Thompson and Camile Williams were Mr. Jones's supervisors.

83. Within weeks of starting at the Agency, Mr. Jones was harassed and intimidated by Camile Williams. She created a threatening work environment for him.

84. Mr. Jones was often authorized and ordered by Dr. Thompson and Ms. Williams to work nights and overtime. He accumulated over 100 hours of overtime hours during his employment which remain unpaid.

85. By February of 2014, Mr. Jones was being ordered to work up to 60 hours a week on various projects without overtime compensation.

86. In mid-February 2014, Dr. Thompson authorized and ordered Mr. Jones to work overtime to complete a complicated report. At that point, Mr. Jones refused to work further overtime without compensation.

87. On February 14, 2014, Mr. Jones was terminated.

**COUNT 1:  Violation of the DC Whistleblower Act (Plaintiffs Teasdell and Meyers)**

88. The D.C. Whistleblower Protection Act, D.C. Code § 1-615.51 *et seq*., is a statute which finds and declares that the public interest is best served when District of Columbia governmental employees are free to report waste, fraud, abuse of authority, violations of law, or threats to the public health or safety without fear of reprisal or retaliation.

89. Because of this purpose, it is against the law for a supervisor to take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order.  § 1-615.53 (a). An employee aggrieved by a violation of § 1-615.53 may bring an action against the District and, in his or her own official capacity, any District employee, supervisor, or official having personal involvement before a court. § 1-615.54 (a) (1).

90. Here, Defendants District of Columbia, Dr. John M. Thompson, and Ms. Camille Williams all acted in violation of the Act by retaliating against Dr. Chantelle Teasdell and Ms. Glendora Meyers after each former District employee reported the systemic and unlawful practice by the Agency to not pay its employees back pay and overtime, as required by law, and for other unlawful reasons as explained without limitation in this complaint. Defendants' retaliation manifested itself in the termination of Dr. Teasdell and Ms. Meyers.

**COUNT 2:  Violation of the Fair Labor Standards Act (29 U.S.C. § 207) (All Plaintiffs, against Defendant District of Columbia)**

91.  The Fair Labor Standards Act, 29 U.S.C. § 207 (a) (1) requires that no employer shall employ an employee for a workweek longer than 40 hours, unless the employee receives compensation for employment in excess of 40 hours at a rate not less than 1 ½ times the regular rate at which the employee is employed.

92. The act exempts certain employees in executive and administrative pay categories. 29 U.S.C. § 213 (a).

93. In order to qualify for the exemption, an employer must pay the employee and all persons in their job class on a "salary basis". *See* 29 CFR § 541.603.

94. For an employee to be considered paid on a "salary basis," they cannot be subject to deductions in pay for absences less than one full day. *See* 29 CFR § 541.602.

95. The Office on Aging had a policy and practice of requiring Dr. Teasdell, Glendora Meyers and other persons in the same and similar job classifications to take "annual leave" hours when they had partial-day absences during regular business hours.

96. Annual leave may be redeemed for cash payment at the end of employment, and is a part of plaintiffs' employment compensation.

97. Because Defendants required Dr. Teasdell and others in her job class to use annual leave for absences less than one day, Dr. Teasdell and others in her job classification were not paid on a salary basis, and therefore were not exempt from the Fair Labor Standards Act overtime pay requirements.

98. Plaintiff Jamal Jones is classified as non-exempt by the District of Columbia due to his job responsibilities and is not exempt from the Fair Labor Standard's Act's overtime requirements.

99. Defendants required Plaintiff Jamal Jones and persons similarly situated to work in excess of 40 hours a week without overtime compensation.

100. At the beginning of his tenure with the District of Columbia, Mr. Jones was compensated for his overtime, but toward the middle and end of his employment, Defendants required Mr. Jones to work increasingly long periods in excess of 40 hours per week without providing overtime compensation.

101. Mr. Jones was fired because he refused to work further overtime without compensation.

102. Defendants continued rampant violations of the FLSA even after multiple employees attempted to deal with the issue at the highest levels of the Office, and with Counsel for the District of Columbia. This demonstrates that the FLSA violations were willful.

103. As a remedy for Defendants' violation of the Fair Labor Standards Act, Plaintiffs are

entitled to double damages. 29 U.S.C. 216 (d). Plaintiffs are also entitled to

reinstatement because they were fired in retaliation for reporting FLSA violations.

*Id.* Plaintiffs further seek court costs and attorneys fees. *Id.*

**PRAYER FOR RELIEF (All Plaintiffs)**

WHEREFORE, Plaintiffs respectfully pray that judgment for each violation be

entered against the Defendants, jointly and severally for the following:

1. Declaratory judgment that Defendants' conduct violated the D.C. Whistleblower Act

   and the Fair Labor Standards Act;

2. Reinstatement to the same position held before the prohibited personnel action or

   to an equivalent position;

3. Reinstatement of employee's seniority rights;

4. Restoration of lost benefits;

5. Back pay and interest on back pay;

6. Front pay;

7. Compensatory damages;

8.  Other actual damages, incidental damages, and consequential damages as will be proved at trial against each of the Defendants, jointly and severally;

9.  Interest on all sums;

10. Special damages as permitted by law;

11. Punitive damages as will be proven at trial against each of the Defendants, jointly and severally;

12. Court costs, expenses and reasonable attorneys fees;

13. Any and all such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

_____/s/_____
Daniel Hornal
Talos Law
705 4th St., NW #403
Washington, DC 20001
(202) 709-9662
Daniel@taloslaw.com
D.C. Bar No. 1005381

*Attorney for Plaintiffs*